**IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE**

**AT KNOXVILLE**

**MARCH 1998 SESSION**

FILED

June 10, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | |
| | ) | **C.C.A. NO. 03C01-9706-CR-00205** |
| Appellee, | ) | |
| | ) | **POLK COUNTY** |
| VS. | ) | |
| | ) | **HON. R. STEVEN BEBB,** |
| **MELVIN DOUGLAS CHASTAIN,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | (Second-Degree Murder) |

FOR THE APPELLANT:                        FOR THE APPELLEE:


**CHARLES CORN**                          **JOHN KNOX WALKUP**
Public Defender                           Attorney General & Reporter

**RICHARD HUGHES**                        **CLINTON J. MORGAN**
Asst. Public Defender                     Asst. Attorney General
P.O. Box 1453                             John Sevier Bldg.
Cleveland, TN  37364-1453                 425 Fifth Ave., North
                                          Nashville, TN  37243-0493

                                          **JERRY N. ESTES**
                                          District Attorney General

                                          **SHARI TAYLOE**
                                          Asst. District Attomey General
                                          P.O. Box 1351
                                          Cleveland, TN  37364-1351


OPINION FILED:_____



**AFFIRMED**


**JOHN H. PEAY,**
Judge

# O P I N I O N

The defendant was indicted for the first-degree murder of his wife, Karen Chastain, and the cause proceeded to trial. The jury found the defendant guilty of second-degree murder, and the trial court sentenced the defendant to twenty years imprisonment as a Range I standard offender. The defendant now appeals as of right from his conviction. He argues that the evidence presented at trial was legally insufficient to support a conviction. The defendant also argues that because the trial court erred in admitting his confessions into evidence, he is entitled to a new trial. Finding no merit in the defendant's contentions, we affirm.

At trial, a police dispatcher testified that she had received a 911 call from the defendant at 9:00 a.m. on March 25, 1996. She dispatched a police officer, Officer Mike Gobble, to the defendant's house, and he arrived at 9:03 a.m. According to Officer Gobble, the defendant told him that his wife had committed suicide. The defendant appeared nervous, jittery, and upset. Officer Gobble went upstairs in the defendant's house, where he found the victim dead, lying across the bed with wounds to her throat and chest. Under the victim's arm was a knife, and lying at her feet was an empty plastic cup that smelled of alcohol. Besides the defendant, the defendant's elderly mother, who had Alzheimer's disease, was the only other person in the house.

Agent David Guy of the Tennessee Bureau of Investigation testified that he had arrived at the scene at approximately 11:00 a.m. He saw the victim lying on the bed and observed multiple stab wounds to both the victim's neck and chest. The victim was wearing three shirts in a layered fashion, but there were no rips or tears anywhere on the victim's clothing. No fingerprints were found on the knife or on the red cup. He collected

2

blood samples from splatters across the bedroom walls, and he noticed what appeared to be blood on the back of the defendant's hands. The defendant told him that he had gotten the victim's blood on his hands when he had checked for a pulse, but Agent Guy did not believe the defendant's explanation to be consistent with the location of the blood, which was on the back of the defendant's hands rather than on the inside of his fingers or his palm. Agent Guy further testified that the clothing the defendant's mother was wearing at the time tested negative for blood. However, the jeans the defendant was wearing at the time had tested positive for blood, although the source of the blood remained unknown.

Agent Guy further testified that at approximately 1:00 p.m., the defendant had voluntarily agreed to go to the sheriff's station for questioning. The defendant was read his Miranda rights at 3:00 p.m., and at 4:17 p.m., the defendant gave his first of four sworn statements, each of which was introduced into evidence and read to the jury. In the defendant's first statement, the defendant represented that he had waked at 8:30 a.m. that morning. His mother was in the living room, watching television. He noticed that his wife's car was still parked in the driveway. Thinking that his wife might be upstairs asleep, he went to the upstairs bedroom, where he found her lying on the bed. He noticed cuts on her body, so he ran downstairs to call 911. The defendant did not mention that he believed his wife's death to be the result of suicide, but he did say that he believed his mother was physically capable of killing his wife.

According to Agent Guy, the defendant agreed to further questioning. At 10:30 p.m., he gave a second sworn statement. In this statement, the defendant said he had waked in the middle of the night, gone upstairs, and had found his wife lying on the bed with a wound to her neck. When he realized she was dying, he became angry,

3

picked up the knife, and stabbed her in the chest. He said he never stabbed her in the neck. He returned downstairs, went back to bed, and woke again at 8:30 a.m. He fed the cats, made some coffee, and then dialed 911.

Again, the defendant agreed to further questioning, and at approximately 11:00 p.m., he gave a third sworn statement. According to this statement, the defendant had waked during the night, gone upstairs, and had found his wife lying on the bed with a wound to her neck. His wife then asked him to "put her out of her misery," so he took the knife from her and stabbed her numerous times in the chest. He said it was possible that he also stabbed her in the neck. He stated that he did not want his wife's death to look like a suicide because he did not want her family to be devastated.

At midnight, the defendant gave his fourth and final sworn statement to the police. According to this statement, when the defendant had waked in the middle of the night, he found his wife in the upstairs bedroom with a knife in her hand. She told him to leave her alone. He took the knife from her and accidentally stabbed her. He then flew into a rage and began stabbing her multiple times. He went back to bed and slept until 8:30 a.m. He fed the cats, made some coffee, called 911, and told the police dispatcher that his wife had committed suicide. Following this statement, the defendant was placed under arrest.

Dr. Charles Harlan, the medical examiner who performed the autopsy on the victim, also testified at trial. According to his testimony, the body of the victim, who was left-handed, had a laceration to the right wrist, twelve stab wounds to the left neck, and fifteen stab wounds to the left chest. Of the victim's stab wounds, only three wounds to the chest were fatal as they penetrated the victim's heart and caused internal bleeding.

4

The victim's blood alcohol reading was .37%, which is high enough to cause a person to lose consciousness. Dr. Harlan testified it would have been difficult for someone with such a high blood alcohol reading to inflict such deep chest wounds on herself, and in his opinion, the victim's death had been a homicide.

The defendant's theory of defense was that the victim committed suicide. By stipulation, the victim's psychiatric records were read to the jury. These records covered the year prior to the victim's death and contained references to depression and suicidal thoughts. A friend of the victim also testified that the victim had been very depressed because of financial problems with her business. To rebut Dr. Harlan's testimony, the defendant introduced the testimony of Dr. Randall Pedigo. Dr. Pedigo was a former medical examiner, but his medical license had been revoked two years prior to trial due to eight felony convictions for unlawful dispensation of controlled substances and sexual battery. At the time of trial, Dr. Pedigo was on probation. Dr. Pedigo testified that he had examined documents and photographs in this case, and in his opinion, the victim's wounds could have been either self-inflicted or inflicted by assault. He based his opinion that the victim's wounds could have been self-inflicted on the idea that suicide patients will often make limited attempts to cut themselves and thus inflict multiple shallow wounds on themselves. It was also Dr. Pedigo's opinion that a person with a .37% blood alcohol content might be able to inflict stab wounds similar to the wounds found on the victim if that person was an experienced drinker.

The defendant testified on his own behalf. According to his testimony, he and his wife had consumed a large quantity of alcohol the night before his wife's death. His wife woke and left their bed during the night. When he woke the following morning, he found her upstairs lying on the bed and he called 911. He testified that he did not kill

his wife, but that his mother was not mentally stable and was capable of killing her. He further testified that only the first sworn statement he gave to the police officers had been correct, and the only reason he gave the other statements was because he had been mentally distraught and intimidated.

On rebuttal, the State introduced the testimony of one of the victim's friends. She testified that four days prior to her death, the victim had said she was going to leave the defendant because he physically and mentally abused her. Sheriff Bill Davis also testified that he had been present when the defendant was questioned and that he had not heard anyone threaten or coerce the defendant into giving his sworn statements.

At the conclusion of the evidence, the jury found the defendant guilty of second-degree murder. The defendant now argues that the evidence is insufficient to support the jury's verdict. As support for this argument, the defendant contends that the medical evidence suggests the victim's death could have resulted from suicide rather than homicide; that the physical evidence failed to conclusively show the defendant stabbed his wife; and that the defendant's second, third, and fourth sworn statements cannot support the jury's verdict because they should have been suppressed as involuntarily given. We fail to find merit in the defendant's arguments.

A defendant challenging the sufficiency of the proof has the burden of illustrating to this Court why the evidence is insufficient to support the verdict returned by the trier of fact in his or her case. This Court will not disturb a verdict of guilt for lack of sufficient evidence unless the facts contained in the record and any inferences that may be drawn from the facts are insufficient, as a matter of law, for any rational trier of fact to find the defendant guilty beyond a reasonable doubt. State v. Tuggle, 639 S.W.2d 913,

6

914 (Tenn. 1982); see Jackson v. Virginia, 443 U.S. 307, 319 (1979).

Moreover, we do not reweigh or re-evaluate the evidence and are required to afford the State the strongest legitimate view of the proof contained in the record as well as all reasonable and legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses, the weight and value to be given to the evidence, as well as factual issues raised by the evidence are resolved by the trier of fact, not this Court. Id. In this way, a guilty verdict rendered by the jury and approved by the trial court accredits the testimony of the State's witnesses. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

Here, the defendant improperly asks this Court to reweigh the evidence presented to the jury. For instance, while the defendant argues that some of the medical evidence supports his theory of defense, i.e., that the victim committed suicide, sufficient evidence remains in the record to support the State's theory of prosecution, i.e., that the defendant stabbed the victim. Conflicts in evidence such as this are properly resolved by the fact finder, and in the instant case, the jury believed the State's version of the events. When viewing the totality of the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the State, the jury was presented sufficient evidence from which to conclude the defendant was guilty beyond a reasonable doubt. See Tuggle, 639 S.W.2d at 914; Cabbage, 571 S.W.2d at 835. Further, we reject the defendant's attempt to argue that his multiple sworn statements confessing to the murder of his wife should have been suppressed. The record fails to reflect that the defendant secured a ruling on his motion to suppress, lodged an objection prior to the confessions being offered into evidence, or included this argument in his new trial motion. Thus, the defendant has waived this issue on appeal. T.R.A.P. 3(e); see State v. Clinton,

7

754 S.W.2d 100, 103 (Tenn. Crim. App. 1988).

Finding sufficient evidence in the record to support the jury's verdict of guilt, we affirm the defendant's conviction.

_____
JOHN H. PEAY, Judge

CONCUR:

_____
PAUL G. SUMMERS, Judge

_____
CORNELIA A. CLARK, Special Judge